**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NORTHRIDGE VILLAGE, LP and** | : | **CIVIL ACTION** |
| **HASTINGS INVESTMENT CO., INC.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No. 15-1947** |
| | : | |
| **TRAVELERS INDEMNITY CO.** | : | |
| **OF CONNECTICUT and** | : | |
| **TRAVELERS CORP.,** | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                                                            **August 31, 2017**

<u>**MEMORANDUM OPINION**</u>

This case involves an insurance coverage dispute stemming from alleged construction defects associated with the development of a planned community in Chester County, Pennsylvania. Presently before me are the cross-motions for summary judgment filed by Plaintiffs, Northridge Village, LP and Hastings Investment Company, Inc. ("Plaintiffs"), and Defendants, Travelers Indemnity Company of Connecticut and Travelers Corporation ("Defendants"). For the reasons set forth below, Plaintiffs' motion will be denied and Defendants' motion will be granted.

## I.     <u>Factual and Procedural Background</u>

Unless otherwise indicated, the following facts are undisputed.

On or about October 3, 2003, Plaintiffs purchased vacant lots in Chester County, Pennsylvania for the purpose of developing a "Planned Community." On May 9, 2005, Plaintiffs recorded a declaration for 170 lots, reserving the right to create an additional 80. Plaintiffs then sold the lots to construction contractors, NVR, Inc. t/a NV Homes and NVR, Inc. t/a Ryan Homes (collectively, "NVR/Ryan"), who constructed houses and sold them to individual owners

1

between September 1, 2005 and January 4, 2010. (Defs.' Statement of Facts ("SOF") ¶¶ 22, 26-28, 55-56; Underlying Compl., Doc. No. 39, Ex. 19 ¶¶ 32, 35, 38-39; Fourth Am. Underlying Compl., Doc. No. 39, Ex. 20 ¶¶ 27-29.)

Plaintiffs also constructed "Common Facilities" (e.g., roads, curbs, fences) for the benefit of the "Community Association," which is a nonprofit corporation that operates as a homeowners association and is comprised of members who own residential units. In doing so, Plaintiffs warranted against structural defects in those facilities. Plaintiffs maintained control of the Community Association until it was transferred to individual owners. (Defs.' SOF ¶ 64; Underlying Compl., Doc. No. 39, Ex. 19 ¶ 1; Fourth Am. Underlying Compl., Doc. No. 39, Ex. 20 ¶¶ 122-23.)

In preparation for the transition of control of the Community Association to the owners, the Community Association commissioned reports and studies evaluating the construction of the Planned Community, as well as Plaintiffs' operation and management thereof. These reports and studies revealed "delinquencies, defects, deficiencies, nonconformities, property damage and lapses." The defects and deficiencies included

> improper/incomplete stormwater management facilities; erosion around detention basin embankments; curbs and storm sewer inlets that are not in alignment with the edge paving; missing curbs; sunken and damaged utility boxes throughout the community; poor drainage and erosion throughout the community; inoperable or improperly installed street lights; PVC fences around the detention basin that are not set at a uniform height and are damaged; unfinished road paving; and improper curb terminations in several areas.

(Defs.' SOF ¶¶ 43-45; Underlying Compl., Doc. No. 39, Ex. 19 ¶ 61.)

On September 13, 2013, the Community Association sued Plaintiffs, along with NVR/Ryan, in the Court of Common Pleas of Chester County over the development and construction of the Planned Community alleging that Plaintiffs performed deficient construction.

The Association filed a fourth amended complaint in Chester County on September 30, 2014, which is presently the operative complaint in the underlying action.[1] (Defs.' SOF ¶¶ 18, 36-37, 46, 54; Underlying Compl., Doc. No. 39, Ex. 19 ¶¶ 54, 58, 64; Fourth Am. Underlying Compl., Doc. No. 39, Ex. 20.)

Defendants have refused to defend Plaintiffs in the underlying action, prompting Plaintiffs to file the instant breach of contract action in this Court.[2] I must now determine whether Defendants had a duty to defend Plaintiffs in the underlying action, which requires consideration of the original and Fourth Amended Underlying Complaints, and the terms of Plaintiffs' general liability policy with Defendants.[3]

A. *The Underlying Complaints*

As previously noted, the reports commissioned by the Community Association identified numerous problems with the Common Facilities. The Community Association filed the original Underlying Complaint against Plaintiffs and NVR/Ryan on September 13, 2013. The allegations in that complaint that are relevant to my analysis are set forth below.

The original Underlying Complaint first alleges that Plaintiffs were responsible for the planning, design, development, creation, and construction of the Planned Community. It also

---

[1] Because I must determine whether the duty to defend was triggered at any point, I will analyze both the original Underlying Complaint and the Fourth Amended Underlying Complaint. See, e.g., Quality Stone Veneer, Inc. v. Selective Ins. Co. of Am., No. 15-6509, 2017 WL 345636, at *1-2 (E.D. Pa. Jan. 23, 2017) (analyzing the original complaint and an amended joinder complaint).

[2] I granted Defendants' partial motion to dismiss on January 21, 2016, dismissing Plaintiffs' bad faith claim and striking portions of the Complaint. (Doc. No. 12.) I then denied Plaintiffs' motion to amend and reinstate the bad faith claim on October 4, 2017. (Doc. No. 30.) As such, the only remaining claim is for breach of contract.

[3] In their motion, Defendants argue that unpaid assessments alleged in the underlying action do not give rise to a duty to defend. (Defs.' Mot. Summ. J. ("DMSJ") at 12-15.) Plaintiffs concede this point, and therefore I will not address the unpaid assessments. (Pls.' Resp. to DMSJ at 7 n.2.)

alleges that "Northridge" sold the lots to third party owners. As such, the complaint asserts that Plaintiffs are liable for defective work that resulted in "numerous failures of the structural, drainage, grading, streets, curbs, alleys, drives, lanes, detention basin deficiencies, landscaping and stormwater management facilities as well as other components of the Community and caused extensive property damage throughout the Community." The defects are alleged to be "continuing and cumulative in nature," and "pervasive throughout the Community and affect[ing] more than two units." The Underlying Complaint also contends that Plaintiffs were "careless and negligent in the performance of their duties in connection with the building and construction of the Community by failing to exercise such reasonable care, technical skill and ability and diligence as are ordinarily required of builders and contractors." Additionally, it is asserted that Plaintiffs were "careless and negligent in the performance of their duties in connection with the hiring of contractors, subcontractors and suppliers, and in their supervision and inspection of the work and materials provided to the Community." (Underlying Compl., Doc. No. 39, Ex. 19 ¶¶ 12, 43, 63-65, 143, 148.)

The Underlying Complaint articulates the following claims: breach of contract; breach of statutory warranties; negligent construction; and negligent supervision. It seeks to recover the cost to repair and/or replace the defects, deficiencies, and nonconformities, as well as funds expended in order to address and remediate the defects, deficiencies, and nonconformities. (Id. ¶¶ 95-106, 115-24, 139-50.)

On September 30, 2014, the Community Association filed a fourth amended complaint, which contains many of the same allegations as the original Underlying Complaint, but clarifies

the following relevant points.[4]  This complaint contends that Northridge "obtained the subdivision approvals and constructed the site improvements to serve the Planned Community," and that NVR/Ryan "contracted with [Northridge] to purchase lots upon which [NVR/Ryan] constructed Units."  The complaint explains that "[NVR/Ryan] sold and conveyed a finished home on each lot to a purchaser."  Additionally, the Fourth Amended Underlying Complaint asserts that "Northridge" constructed the Common Facilities and warranted against structural defects.  Finally, it explains that the "defects and deficiencies . . . affect units, lots, common elements and limited common elements."  (Fourth Am. Underlying Compl., Doc. No. 39, Ex. 20 ¶¶ 27-29, 57, 122-23.)

The Fourth Amended Underlying Complaint reconfigures the causes of action against Plaintiffs to include not only breach of statutory warranties, but also breach of fiduciary duty and an action for a declaratory judgment.  (Id. ¶¶ 117-73.)

Defendants denied coverage on September 26, 2013 and reaffirmed their denial on February 17, 2014.  (Defs.' SOF ¶¶ 75-76.)

*B.  The Insurance Policies*[5]

Defendants provided general insurance liability policies ("CGL Policies") to Plaintiffs on an annual basis from February 15, 2004 through February 15, 2015.  (Doc. No. 39, Exs. 1-10.)  These policies each provide "occurrence" coverage subject to a limit of $1,000,000 per occurrence, a $2,000,000 general aggregate limit, and a $2,000,000 products-completed operations aggregate limit.  (E.g., Id., Ex. 9 at 10.)  Defendants also provided commercial excess

---

[4] The Second and Third Amended Complaints were filed against Plaintiffs in Chester County, however, Plaintiffs did not provide these complaints to Defendants.  (DMSJ at 5 n.3.)

[5] The parties agree that the policies are all materially the same, with one exception discussed infra in footnote 8.  I will therefore cite to language from only one CGL Policy and one Excess Policy as examples.

liability umbrella policies ("Excess Policies") to Plaintiffs from January 12, 2006 through February 15, 2014, which are triggered only if the CGL Policies are exhausted. (Id., Exs. 11-18.) Each of these policies provides excess coverage subject to limits of $2,000,000 per "any one occurrence," a $2,000,000 products/completed operations aggregate limit, and a $2,000,000 general aggregate limit. (E.g., Id., Ex. 17 at 3, 6.) The CGL Policies provide Defendants coverage for "bodily injury" and "property damage" as follows:

> "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." However, coverage applies to "bodily injury" and "property damage" only if caused by an "occurrence" that takes place in the "coverage territory." An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

(E.g., Id., Ex. 9 at 14, 25, 27-28.)

The CGL Policies also contain numerous exclusions and endorsements, including the following:

**EXCLUSION – REAL ESTATE DEVELOPMENT ACTIVITES – COMPLETED OPERATIONS**

. . .

**PROVISIONS**

A.  This insurance does not apply to "bodily injury" or "property damage" that is included in the "products-completed operations hazard" and that arises out of any "real estate development activities" by or on behalf of any insured. . . .

C. The following definition is added to **SECTION V – DEFINITIONS**:

"Real estate development activities" means the design, site preparation, construction, marketing or sales of residential, commercial or industrial buildings.

D. The Provisions of this endorsement do not apply to the repair, maintenance, renovation, alteration or addition to an existing building owned by the Named Insured.

(Id. at 30.)  "Products-completed operations hazard" is defined as follows:

"Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or
(2) Work that has not yet been completed or abandoned.  However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.
(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(Id. at 27.)

The Excess Policies are similar to the CGL Policies, providing excess coverage on an "occurrence" basis only if the CGL Policy has been exhausted.  (E.g., Id., Ex. 17.)  These policies insure the "ultimate net loss" in excess of the limit covered by the CGL Policies, but only for damages arising from "bodily injury," "property damage," "personal injury," or "advertising injury."  (Id. at 6.)  "Bodily injury" and "property damage" are covered only if caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Id. at 6, 16.)

*C. The Present Action*

After the Community Association sued Plaintiffs in state court, it sought coverage from Defendants. Defendants denied coverage through correspondence dated September 26, 2013 and February 17, 2014. (Defs.' SOF ¶¶ 75-76.) Plaintiffs filed the action before me on April 13, 2015, seeking coverage under the CGL Policies and Excess Policies, contending Defendants have a duty to defend and indemnify.

## II.    Legal Standard

A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact in dispute, and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). A factual dispute is "material" if it might affect the outcome of the suit under the appropriate governing law. Id. The non-moving party cannot avert summary judgment with speculation or conclusory allegations, but rather must cite to the record. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court considers the evidence in the light most favorable to the non-moving party. Anderson, 477 U.S. at 256.

Where cross-motions for summary judgment have been filed, as is the case here, the following standards apply:

> In cases where the parties filed cross-motions for summary judgment, each side essentially contends that no issue of material fact exists from its perspective. We

must, therefore, consider each motion for summary judgment separately. The standards under which we grant or deny summary judgment do not change because cross-motions are filed. Each party still bears the initial burden of establishing a lack of genuine issues of material fact. Such contradictory claims do not necessarily guarantee that if one party's motion is rejected, the other party's motion must be granted.

Wlliams v. Phila. Housing Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994).

## III.    Discussion

Defendants contend they do not have a duty to defend because, as a matter of law, (1) construction defects and their foreseeable consequences do not constitute an "occurrence" under the CGL Policies; and (2) even if Plaintiffs could establish that the factual allegations fall within the insuring policies, exclusions in the policies preclude coverage. Plaintiffs counter that, as a matter of law, (1) the underlying allegations pertaining to construction defects do constitute an "occurrence" giving rise to a duty to defend; and (2) the exclusions Defendants rely upon do not apply.

The initial question before me, then, is whether the allegations in the underlying action were the result of an "occurrence" as defined by the CGL Policies and Excess Policies, and thus triggering a duty to defend.

### A.  Duty to Defend

Under Pennsylvania law, an insurer has a duty to defend an insured if the complaint in the underlying action against the insured potentially comes within the ambit of the policy's coverage.[6]  Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 225 (3d Cir. 2005).  The duty to defend is distinct from the duty to indemnify, but is broader; thus, if there is no duty to defend,

---

[6] The parties agree that Pennsylvania law applies to this case.

there is no duty to indemnify.  Id.; see also Kvaerner Metals Div. v. Commercial Union Ins. Co., 908 A.2d 888, 896 n.7 (Pa. 2006).

In order to determine whether Defendants had a duty to defend, I must define the scope of coverage provided by the CGL Policies and Excess Policies, and then determine whether the complaint in the underlying matter gives rise to a duty to defend.  Id. at 226.  In Pennsylvania, courts follow the "four corners rule," considering only the allegations in the complaint in the underlying action.  Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 679 (3d Cir. 2016).  In determining whether an underlying complaint triggers a duty to defend, courts focus on the complaint's factual allegations, not the terminology used to label the causes of action.  State Farm Fire & Cas. v. Brighton Exteriors, Inc., No. 14-03987, 2015 WL 894419, at *4 (E.D. Pa. Mar. 3, 2015).  Courts liberally construe the allegations in the underlying action in favor of the insured.  Ramara, Inc., 814 F.3d at 673.  In short, an insurer has a duty to defend if there is "any possibility that coverage has been triggered," and the insurer can cease coverage only when "it becomes absolutely clear that there is no longer a possibility that the insurer owes its insured a defense."  Id. at 673-74.

The insured bears the initial burden of proving that a particular claim falls within the coverage of a policy.  Jacobs Constructors, Inc., v. NPS Energy Services, Inc., 264 F.3d 365, 376 (3d Cir. 2001) (citing Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1366-67 (Pa. 1987)).  If the insured meets its burden, it is then the burden of the insurer to establish that an exclusion applies.  Erie Ins. Exch., 533 A.2d at 1366.

### B.  Scope of Coverage

As noted above, this dispute turns on whether there was an "occurrence" under the CGL Policies and Excess Policies.  Pennsylvania courts and the United States Court of Appeals for the

Third Circuit have interpreted this term of art in an attempt to draw clear lines around what does and does not constitute an "occurrence." Much of the parties' disagreement focuses on <u>Kvaerner Metals Div. v. Commercial Union Ins. Co.</u>, 908 A.2d 888 (Pa. 2006) and its progeny.

In <u>Kvaerner</u>, the plaintiff in the underlying action had contracted with Kvaerner to have a coke oven battery designed and constructed. 908 A.2d at 891. That plaintiff sued Kvaerner, alleging that the finished coke oven battery was damaged and failed to meet contract standards and warranties, as well as industry standards. <u>Id.</u> Kvaerner notified its insurer of the lawsuit, which denied coverage on the basis that the underlying suit did not fall within the insurance policies' coverage provisions because it was not an "occurrence." <u>Id.</u> at 892. When Kvaerner sought a declaratory judgment, the insurer moved for summary judgment, arguing that the policies provided coverage only for "property damage" caused by an "occurrence," which was defined in the policy as an "accident, including continuous or repeated exposure to substantially the same or general harmful conditions." <u>Id.</u> at 897.

Examining what constitutes an "accident," the Supreme Court of Pennsylvania held that "the definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty workmanship." <u>Id.</u> at 899 (footnote omitted). The Court reasoned that "[s]uch claims simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident' or its common judicial construction in this context." <u>Id.</u> As such, the Court concluded that the insurer did not have a duty to defend Kvaerner because the underlying allegations concerned property damage resulting from defective workmanship to the work product itself. <u>Id.</u>

Plaintiffs contend that <u>Kvaerner</u> is not controlling here because the underlying allegations include claims related to damage to "other property beyond the site improvements and other

Common Facilities," as well as negligent construction and negligent hiring or supervision. Plaintiffs further assert that a new majority rule has developed, differing from the holding in Kvaerner, whereby faulty design or workmanship can constitute an "occurrence." (Pls.' Resp. to DMSJ at 11-12.) As discussed below, contrary to Plaintiffs' belief, Pennsylvania courts have reinforced the holding of Kvaerner in subsequent cases.

The first decision to apply Kvaerner's holding was Millers Capital Ins. Co. v. Gambone Bros. Dev. Co., 941 A.2d 706 (Pa. Super. Ct. 2007). There, Gambone Brothers had planned, developed, and built two housing developments. Gambone Bros., 941 A.2d at 708. Two groups of homeowner plaintiffs sued Gambone Brothers over damage to homes attributable to faulty workmanship. Id. Specifically, the first group of plaintiffs complained of water leaks causing damage to the homes' interiors as a result of "construction defects and product failures" in the homes' vapor barriers, windows, roofs, and stucco exteriors. Id. at 709. The second group of plaintiffs alleged that Gambone Brothers used defective stucco on the homes, which resulted in "delamination, peeling, disfigurement, compromise of structural integrity, infiltration by the elements, mold, cracking of the interior cladding, and moisture penetration and entrapment in and through said system." Id. They claimed these defects resulted from faulty workmanship, including "faulty design, implementation, workmanship, and supervision of the application of the exterior." Id. at 709-10.

Gambone Brothers sought coverage from its insurer, which denied coverage and sought a declaratory judgment that no coverage applied. Like in Kvaerner, the insurance policies covered only "bodily injury" and "property damage" caused by an "occurrence," which was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 711. Gambone Brothers contended that the case was distinguishable

from Kvaerner because the underlying allegations pertained to not only faulty workmanship that resulted in flawed stucco exteriors, but also "ancillary and accidental damage" to non-defective work inside of the homes caused by the water leaks. Id. at 713.

The Superior Court of Pennsylvania rejected Gambone Brother's position, finding that the "weight of common sense collapses the distinction Gambone attempts to create." Id. The court focused on the degree of fortuity associated with the damage and emphasized that the Kvaerner Court had suggested that "natural and foreseeable acts . . . [,] which tend to exacerbate the damage, effect, or consequences" of faulty workmanship, cannot be considered to be fortuitous so as to constitute an "occurrence." Id. The Superior Court thus concluded that the insurer had no duty to defend or indemnify Gambone Brothers. Id. at 718.

Kvaerner was next applied by the Superior Court of Pennsylvania in Erie Ins. Exch. v. Abbott Furnace Co., 972 A.2d 1232 (Pa. Super. Ct. 2009). Abbott Furnace had entered into a contract to provide Innovative Magnetic, Inc. ("IMI") with an annealing furnace. Abbott Furnace Co., 972 A.2d at 1234. IMI discovered defects in the design of the furnace and sued Abbott Furnace, alleging negligent design and manufacturing that "actively malfunctioned and physically damaged or destroyed" other personal property owned by IMI. Id. at 1235-36. Abbott Furnace notified the insurer of the underlying matter, and the insurer denied coverage, maintaining that none of the underlying allegations triggered a duty to defend. Id.

Abbott Furnace argued that the case differed from Kvaerner because the underlying allegations contained a negligence claim regarding the furnace actively malfunctioning and causing damage to other IMI property. Id. at 1237. The Superior Court examined the "gist of action" in determining whether the negligence claim was properly pled. Concluding that it was not, the Superior Court observed that the contract claim was at the heart of the underlying

allegations because the damage resulted from Abbott's breach of contract in failing to design the furnace in accordance with IMI's requests.  Id. at 1238-39.  The court thus found that the insurer had no duty to defend because the contractual claims were for poor workmanship.  Id. at 1239.

In Indalex Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 83 A.3d 418 (Pa. Super. Ct. 2013), another case interpreting Kvaerner, the property and homeowners sued Indalex, alleging it had defectively designed and manufactured windows and doors, which resulted in water leakage that caused physical damage and personal injury.  Indalex Inc., 83 A.3d at 419-20.  They brought claims of strict liability, negligence, breach of warranty, and breach of contract.  Id. at 420.  The insurer denied coverage on the basis that there was no "occurrence," and Indalex sued the insurer, contending it was entitled to coverage under a commercial umbrella policy.  Id.

The Superior Court of Pennsylvania reiterated that "the Kvaerner holding was limited to situations 'where the underlying claims were for breach of contract and breach of warranty, and the only damage was to the [insured's] work product."  Id. at 424.  In contrast, Indalex's claims were "framed in terms of bad product," which could be construed as an "active malfunction," and not merely faulty workmanship.  Id.  The Superior Court also noted that the language of the umbrella policy created a subjective definition of "occurrence," which could include the underlying allegations for which Indalex sought coverage.[7]  Id. at 424-25.  The Superior Court thus held that the insurer had a duty to defend because the underlying claims involved product-liability-based tort claims.  Id. at 425.

Most recently, the Superior Court applied Kvaerner in Hagel v. Falcone, 2014 WL 8331846 (Pa. Super. Ct. 2014).  There, homeowners contracted with Penn Framing Co. Inc.

---

[7] The language of the policy, as it pertains to the definition of "occurrence," read: "As respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the insured."  Indalex, 83 A.3d at 424-25.

("Penn Framing") for the construction of a home. <u>Hagel</u>, 2014 WL 8331846, at *1. Rainfall from a storm revealed leaks around window frames, which caused drywall to separate, mold growth, and damage to the structure and the homeowners' personal items. <u>Id.</u> An inspection revealed that the windows and stucco siding had been improperly installed, resulting in cracking that left the home vulnerable to water intrusion. <u>Id.</u> at *2. The homeowners sued Penn Framing, bringing negligence claims. <u>Id.</u> Default judgment was entered against Penn Framing, and the homeowners then requested an entry of judgment against Penn Framing's insurer. <u>Id.</u>

The insurer contended that the policy underlying the coverage did not provide coverage because the allegations did not constitute "occurrences." <u>Id.</u> at *2-3. The homeowners argued, like Plaintiffs do here, that the case was more like <u>Indalex</u>, focusing on the difference between damages to the product alleged to be faulty and damages to other property or personal property. <u>Id.</u> at *10. They also asserted that the claims were based in negligence, evidenced by a lack of contract between them and the insurer. <u>Id.</u>

The Superior Court first observed that <u>Kvaerner</u>, <u>Gambone Brothers</u>, and <u>Abbott Furnace</u> left open the possibility that there could be an "occurrence" where faulty workmanship causes damage to property other than the insured's work product. <u>Id.</u> at *11. The Superior Court noted, however, that the Third Circuit had, in two separate cases, found that <u>Kvaerner</u> and <u>Gambone Brothers</u> foreclosed that possibility. <u>Id.</u> (citing <u>Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.</u>, 562 F.3d 591 (3d Cir. 2009); <u>Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.</u>, 609 F.3d 223 (3d Cir. 2010)). The Superior Court referenced <u>Specialty Surfaces</u>, where the insured had also argued that damage to property other than their work product constituted an "occurrence," and that the Third Circuit found that this position "ignores that the <u>Gambone Brothers</u> court, following <u>Kvaerner</u>, clearly focused on whether the alleged damage was caused by an accident or

unexpected event, or was a foreseeable result of the faulty workmanship." Id. at *12 (quoting Specialty Surfaces Int'l, Inc., 609 F.3d at 239) (emphasis omitted).

Finding the Third Circuit's approach to be appropriate, the Superior Court in Hagel focused its own analysis on the foreseeability related to faulty workmanship. Id. at *13. The Superior Court concluded it was foreseeable that faulty workmanship leaving a house's exterior weakened would render that home vulnerable to water that could damage the home, as well as the property and people inside. Id. Thus, the Superior Court determined that coverage did not apply because the allegations did not constitute an "occurrence." Id. The Superior Court also rejected the homeowners' argument that the case was like Indalex, observing that "the most critical element in Indalex was that the appellant's claims were product-liability/tort claims" based on damages to persons or property other than the insured's work product. Id. at *12. The court found that claims like those in Indalex were absent because faulty workmanship was at issue, not active malfunction or product liability. Id.

Courts in this Circuit have consistently applied Kvaerner and held that claims based upon faulty workmanship do not amount to an "occurrence," and thus do not trigger an insurer's duty to defend. See, e.g., Specialty Surfaces Int'l, Inc., 609 F.3d at 238-39 (finding damage caused by faulty workmanship was not caused by an "occurrence"); Nationwide Mut. Ins. Co., 562 F.3d at 598 (finding no duty to defend where underlying allegations were "based in contract and [did] not arise from covered 'occurrences'"); Quality Stone Veneer, Inc. v. Selective Ins. Co. of Am., No. 15-6509, 2017 WL 345636, at *8 (E.D. Pa. Jan. 23, 2017) (finding that allegations of faulty workmanship "cannot constitute an occurrence under the CGL policy"); Westfield Ins. Co. v. Bellevue Holding Co., 856 F. Supp. 2d 683, 702 (E.D. Pa. 2012) (finding no duty to defend because "[u]nder well-established Pennsylvania law, claims of and damage resulting from faulty

workmanship do not have a sufficient degree of fortuity contemplated by the ordinary definition or common judicial construction of the term 'accident'"); Zurich Am. Ins. Co. v. R.M. Shoemaker Co., No. 12-873, 2012 WL 895451, at *7 (E.D. Pa. Mar. 16, 2012), *aff'd*, 519 F. App'x 90 (3d Cir. 2013) ("In Pennsylvania, property damage resulting from faulty workmanship under a contract is reasonably foreseeable and does not have the "degree of fortuity" required for an accident to occur."); Bomgardner v. State Farm Fire and Cas., No. 10-1287, 2010 WL 3657084, at *4 (E.D. Pa. Sept. 14, 2010) (finding no duty to defend claims based on faulty workmanship); Peerless Ins. Co. v. Brooks Sys. Corp., 617 F. Supp. 2d 348, 357 (E.D. Pa. 2008) (finding no duty to defend where allegations in the underlying complaint were for faulty workmanship, which "cannot constitute an 'occurrence'").

The same conclusion has been reached in this Circuit in cases where the faulty workmanship results in foreseeable damage to property other than the insured's work product. See, e.g., Specialty Surfaces Int'l, Inc., 609 F.3d at 238-39 (finding no duty to defend where damage was caused by water leaks resulting from faulty workmanship because "damages that are a reasonably foreseeable result of the faulty workmanship are also not covered under a commercial general liability policy"); Nationwide Mut. Ins. Co., 562 F.3d at 598-99 (finding no duty to defend where the underlying allegations were for consequential damages of a breach of contract); Quality Stone Veneer, Inc., 2017 WL 345636, at *8 (citing Gambone Brothers, Specialty Surfaces, Bomgardner, and Zurich in finding that underlying allegations of damage to more than the insured's work product did not constitute an "occurrence"); Brighton Exteriors, Inc., 2015 WL 894419, at *6 ("Under Third Circuit precedent, there is no duty to defend even if the alleged faulty stucco work causes additional damage."); Zurich American Ins. Co., 2012 WL 895451, at *7 (stating that property damage resulting from faulty workmanship is reasonably

foreseeable and therefore not an "occurrence," even where the damage is to property other than the insured's faulty product).

Additionally, courts in this Circuit applying Kvaerner have found that allegations of faulty workmanship recast as negligence claims do not constitute an "occurrence." See, e.g., Quality Stone Veneer, Inc., 2017 WL 345636, at *8 (finding that claims labeled as negligence claims stemmed from faulty workmanship and thus did not trigger a duty to defend); State Farm Fire & Cas. Co. v. Kim's Asia Constr., No. 15-6619, 2016 WL 5848851, at *5 (E.D. Pa. Oct. 5, 2016) (finding that a negligence claim did not trigger a duty to defend because "nothing in the Underlying Complaint suggests that [the insured's] claim is anything other than a claim of faulty workmanship"); Westfield Ins. Co., 856 F. Supp. 2d at 694 (collecting cases where courts applied Kvaerner's definition of "occurrence" even where faulty workmanship claims had been cast as negligence claims). Similarly, the Third Circuit has found that faulty workmanship claims that have been recast as negligent supervision claims do not amount to "occurrences." See, e.g., Zurich Am. Ins. Co. v. R.M. Shoemaker Co., 519 F. App'x 90, 93 (3d Cir. 2013) ("Faulty workmanship—whether caused by the contractor's negligence alone or by the contractor's negligent supervision, which then permitted the willful misconduct of its subcontractors—does not amount to an 'accident' or 'occurrence.'"); see also State Farm Fire & Cas. Co. v. Moreco Constr., Inc., 171 F. Supp. 3d 373, 383 (E.D. Pa. 2016) ("[A] negligent supervision claim does not amount to an "occurrence.").

Given the weight of Pennsylvania and Third Circuit precedent, I conclude that the term "occurrence" in Defendants' CGL Policies and Excess Policies does not include faulty workmanship. Further, the definition of "occurrence" excludes negligence claims premised on faulty workmanship.

*C. Defendants Have No Duty to Defend Plaintiffs in the Underlying Action*

Having determined the scope of coverage provided by the policies, I now examine the underlying allegations to determine whether they give rise to a duty to defend. A review of the underlying allegations reveals that the claims are truly for faulty workmanship. Such claims are not "accidents" and thus not "occurrences" under the CGL Policies or Excess Policies, and therefore Defendants have no duty to defend Plaintiffs.

1. <u>The Underlying Complaint</u>

The original Underlying Complaint alleges that Plaintiffs are liable for various construction defects to the insured's property, as well as other components of the Planned Community. It also contends that Plaintiffs were negligent in the performance of their duties in connection with the building and construction of the Planned Community, as well as in their duties to supervise contractors, subcontractors, and suppliers. (Underlying Compl., Doc. No. 39, Ex. 19 ¶¶ 63-65, 143, 148.)

After thorough review of the allegations in the Underlying Complaint, I find that the negligent construction and negligent supervision counts are for faulty workmanship. Specifically, the Community Association complains of structural, drainage, grading, streets, curbs, alleys, drives, lanes, detention based deficiencies, landscaping and stormwater management facility defects and deficiencies. As explained at length above, claims for faulty workmanship cannot constitute an "occurrence" under the CGL Policies or the Excess Policies. See <u>Kvaerner</u>, 908 A.2d at 899 (holding that "the definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty workmanship");

see also Specialty Surfaces Intern., Inc., 609 F.3d at 231 (confirming that Kvaerner's holding barred coverage for claims of faulty workmanship).

Plaintiffs press two points in an attempt to distinguish the facts alleged in the Underlying Complaint from those in Kvaerner. First, they stress that the Underlying Complaint asserts property damage to "related property," beyond Plaintiffs' work product (i.e., the Common Facilities).

The line this argument draws between the alleged defective work and resulting property damage is a distinction without a difference. Plaintiffs point to language in the Underlying Complaint stating that the "defects and deficiencies are not exhaustive and all defects and deficiencies are continuing and cumulative in nature, as is the extensive property damage which has resulted and continues to result from the defects and deficiencies." Plaintiffs also focus on other language in the complaint, which states that "defective work . . . has resulted in numerous failures of the structural, drainage, grading, streets, curbs, alleys, drives, lanes, detention basin deficiencies, landscaping and stormwater management facilities as well as other components of the Community and cause extensive property damage throughout the Community." (Pls.' Resp. to DMSJ at 8-9) (quoting Underlying Compl., Doc. No. 39, Ex. 19 ¶¶ 63-64.)

But, even if these vague references to consequential damage can be construed to allege damage to property other than Plaintiffs' work, the Kvaerner Court's holding has been extended to other property where the damage is a foreseeable result of the insured's faulty workmanship. See Specialty Surfaces Int'l, Inc., 609 F.3d at 238-39; Nationwide Mut. Ins. Co., 562 F.3d at 598-99; Quality Stone Veneer, Inc., 2017 WL 345636, at *8; State Farm Fire & Cas. Co., 2015 WL 894419, at *6; Zurich American Ins. Co., 2012 WL 895451, at *7.

In Specialty Services, the Third Circuit found that alleged damage to a subgrade system not installed by the insured was not an "occurrence" because the damage was a result of a leak stemming from the insured's defective installation of a subdrain system. Specialty Services Intern., Inc., 609 F.3d at 238-39. The court relied on Gambone Brothers, reasoning that because it was foreseeable that improper installation of the subdrain system could result in a leak and then damage to the subgrade system, the underlying allegations did not amount to an "occurrence." Id. at 239. According to the Third Circuit, and the Superior Court of Pennsylvania in Gambone Brothers and Hagel, it is the "fortuitous" nature of the resulting damage that controls whether it could be an "occurrence." Id. (quoting Gambone Brothers, 941 A.2d at 713).

Here, like in Specialty Surfaces, the references to consequential property damage in the underlying complaint are directly linked to the defective work that Plaintiffs were alleged to have performed. While the language Plaintiffs point to contains vague allegations of damage to work beyond their work product (the Common Facilities), the allegations plainly describe consequential damages that are a result of the defective workmanship. (Underlying Compl., Doc. No. 39, Ex. 19 ¶¶ 63-65) ("[T]he extensive property damage . . . resulted and continues to result from the defects and deficiencies . . . ."). Consequential damage resulting from structural, drainage, grading, streets, curbs, alleys, drives, lanes, detention based deficiencies, landscaping and stormwater management facility defects and deficiencies is entirely foreseeable, and thus is not an "occurrence" and does not trigger a duty to defend under the CGL Policies or the Excess Policies.[8]

---

[8] In their motion for summary judgment, Defendants reference an endorsement contained in the CGL Policies effective February 15, 2012 through February 15, 2014. (DMSJ at 20-22.) The endorsement amended the definition of "occurrence" for those years such that an "occurrence"

Plaintiffs next emphasize that the Underlying Complaint alleges negligent construction and negligent supervision of contractors or subcontractors.  (Pls.' Resp. to DMSJ at 8-10.)  It is equally inconsequential that the underlying allegations assert negligent construction and negligent supervision of contractors or subcontractors.  Faulty workmanship claims recast as negligence claims do not constitute an "accident," and thus do not constitute an "occurrence." See, e.g., Quality Stone Veneer, Inc., 2017 WL 345636, at *8; Westfield Ins. Co., 856 F. Supp. 2d at 694.  The underlying allegations here pertain wholly to faulty workmanship resulting in defects and deficiencies and the foreseeable consequences.  Regarding the negligent supervision claims, the Third Circuit has stated that "[f]aulty workmanship—whether caused by the contractor's negligence alone or by the contractor's negligent supervision, which then permitted the willful misconduct of its subcontractors—does not amount to an 'accident' or 'occurrence.'" Zurich Am. Ins. Co., 519 F. App'x at 93.  The court rejected the argument that faulty workmanship by a subcontractor instead of the insured constitutes an "occurrence."  Id. (citing Kvaerner and Gambone Brothers); see also Moreco Constr., Inc., 171 F. Supp. 3d at 383; Bomgardner, 2010 WL 3657084, at *4-5.

I disagree with Plaintiffs' contention that Indalex calls for a different conclusion.  The Indalex court found that the insurer had a duty to defend where the underlying complaint alleged a "bad product," which could be construed as an "'active malfunction,' and not merely bad

---

was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," or "an act or omission, including all related acts or omissions, that causes 'resulting property damage arising out of your product' or 'resulting property damage arising out of your work.'"  (E.g., Doc. No. 39, Ex. 9 at 54.)  Plaintiffs do not address this endorsement in either their motion for summary judgment or their response to Defendants' motion for summary judgment.  Thus, Plaintiffs have failed to meet their burden of proving that this endorsement gives rise to a duty to defend.  See Jacobs Constructors, Inc., 264 F.3d at 376. Moreover, as discussed infra, I find that the "Real Estate Development Activities – Completed Operations" exclusion precludes coverage.

workmanship." <u>Indalex</u>, 83 A.3d at 424. <u>Indalex</u> did not announce a new majority rule, but instead carved out a discrete scenario where a claim based in products liability could constitute an "occurrence." <u>See</u> <u>Hagel</u>, 2014 WL 8331846, at *12 ("The most critical element in <u>Indalex</u> was that the appellant's claims were product-liability/tort claims."). The underlying allegations here do not amount to an "active malfunction" in any product, nor do they state a product liability claim. Rather, the allegations pertain solely to faulty workmanship and the foreseeable consequences of faulty workmanship, and thus do not amount to an "occurrence."[9]

In light of the reasons articulated above, I find that Plaintiffs have not proven that the underlying allegations fall within the CGL Policies or Excess Policies,[10] and therefore conclude that the Underlying Complaint does not give rise to Defendants' duty to defend.

### 2. The Fourth Amended Underlying Complaint

The Fourth Amended Underlying Complaint contains allegations similar to the original Underlying Complaint in so far as it alleges that Plaintiffs are liable for various defects that are pervasive throughout the Planned Community. As detailed above, the Fourth Amended Underlying Complaint makes clear that Northridge constructed the Common Facilities and warranted against structural defects. Additionally, it contends that Northridge obtained the

---

[9] Plaintiffs cite to cases decided in other jurisdictions as evidence that a "clear majority rule" has emerged, indicating that claims of faulty workmanship or construction can constitute an "occurrence." They also cite to cases decided in other jurisdictions for the proposition that faulty workmanship performed by a subcontractor can constitute an "occurrence." (Pls.' Resp. to DMSJ at 14-16.) These cases are not relevant to the motion before me because, as a court sitting in diversity, I am bound to follow Pennsylvania state law. <u>See</u> <u>Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, 253 (3d Cir. 2010). Thus, my decision must be guided by <u>Kvaerner</u> and its progeny.

[10] Plaintiffs have also failed to assert that the underlying allegations would exceed the limits of the CGL Policies, and have thus failed to allege that the Excess Policies were triggered by exhaustion of the CGL Policies. Accordingly, Plaintiffs have not demonstrated that the underlying allegations give rise to coverage under the Excess Policies.

subdivision approvals and constructed the site improvements, and then contracted with NVR/Ryan to purchase lots and construct units on them. NCR/Ryan sold and conveyed a finished home on each lot to a purchaser.[11] (Fourth Am. Underlying Compl., Doc. No. 39, Ex. 20 ¶¶ 27-29, 55-56, 123.)

Like the Underlying Complaint, the Fourth Amended Underlying Complaint alleges property damage as a result of faulty workmanship, which cannot constitute an "occurrence" under the CGL Policies or the Excess Policies. See Kvaerner, 908 A.2d at 899; see also Specialty Surfaces Intern., Inc., 609 F.3d at 231. Similarly, the allegations of damage to property beyond the insured's own work product do not constitute an "occurrence" where that damage is foreseeable. See Specialty Surfaces Int'l, Inc., 609 F.3d at 238-39; Nationwide Mut. Ins. Co., 562 F.3d at 598-99; Quality Stone Veneer, Inc., 2017 WL 345636, at *8.

Here, the allegations in the Fourth Amended Underlying Complaint do not assert "active malfunction" in any product, nor do they state a products liability claim. Instead, they pertain only to faulty workmanship resulting in structural, drainage, grading, streets, curbs, alleys, drives, lanes, detention basin deficiencies, landscaping, and stormwater management facility defects and deficiencies, which do not constitute an "occurrence" under the CGL Policies or the Excess Policies. Likewise, the allegations of damage to property beyond Plaintiffs' work product are directly linked to the listed defects and deficiencies that Plaintiffs were alleged to have caused, and are thus entirely foreseeable and do not constitute an "occurrence" under the CGL Policies or Excess Policies. Therefore, the allegations in the Fourth Amended Underlying Complaint also do not trigger a duty to defend.

---

[11] It is alleged that Hastings, as general partner of Northridge, "is jointly liable for all debts and obligations of Northridge." (Fourth Am. Underlying Compl., Doc. No. 39, Ex. 20 ¶ 144.)

Finally, even if Defendants' duty to defend were triggered, as detailed below, I find that coverage is precluded under the "Real Estate Development Activities" exclusion.

### D. The "Real Estate Development Activities" Exclusion Precludes Coverage

Defendants argue that even if the allegations constitute an "occurrence," the exclusion titled "Real Estate Development Activities – Completed Operations" precludes coverage. (DMSJ at 22-24.) Plaintiffs respond that the exclusion does not apply because they did not sell residential buildings, or in the alternative, the exclusion is ambiguous and should be construed in their favor. (Pls.' Resp. to DMSJ at 16-19.)

The "Real Estate Development Activities" exclusion bars coverage for "'bodily injury' or 'property damage' that is included in the 'products-completed operations hazard' and that arises out of any 'real estate development activities' by or on behalf of any insured." This exclusion defines "real estate development activities" as "the design, site preparation, construction, marketing or sales of residential, commercial or industrial buildings." (E.g., Doc. No. 39, Ex. 9 at 30.) "Products-completed operations hazard" includes "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work,'" with the exception of products still in the physical possession of the insured, or uncompleted or abandoned work. Work is deemed to be completed at the earliest of the following: (1) "[w]hen all of the work called for in your contract has been completed"; (2) "[w]hen all of the work to be done at the job site has been completed if your contract calls for work at more than one job site"; or (3) "[w]hen that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." (Id. at 27.)

As an initial matter, I find that the exclusion's language is not ambiguous. A provision is ambiguous where it is susceptible to more than one reasonable interpretation. Medical Protective Co. v. Watkins, 198 F.3d 100, 103-04 (3d Cir. 1999). A court should read a policy so as to avoid ambiguities and give effect to all of its provisions. Id. at 103. Plaintiffs have not provided any alternative interpretation of the exclusion. I will therefore treat the exclusion as unambiguous and determine whether the underlying allegations arise out of "real estate development activities" and assert "property damage" included in the definition of a "products-completed operations hazard."

The Underlying Complaint states that Plaintiffs "were responsible for the planning, design, development, creation and construction of the Community" and "are engaged in the business of, among other things, developing real property for residential occupancy and providing construction and architectural services." (Underlying Compl., Doc. No. 39, Ex. 19 ¶¶ 12, 22.) The Fourth Amended Underlying Complaint alleges that Northridge "created the Planned Community." (Fourth Am. Underlying Compl., Doc. No. 39, Ex. 20 ¶ 10.) Because the definition of "real estate development activities" includes "the design, site preparation, construction, marketing **or** sales of residential, commercial or industrial buildings," Plaintiffs' planning, design, development, creation, and construction of the Planned Community constitutes "real estate development activities."

Regarding whether the underlying allegations assert "property damage" included in the definition of a "products-completed operations hazard," both the Underlying Complaint and Fourth Amended Underlying Complaint state that the units in the Planned Community were sold to third-party unit owners between September 1, 2005 and January 4, 2010. (Underlying Compl., Doc. No. 39, Ex. 19 ¶ 43; Fourth Am. Underlying Compl., Doc. No. 39, Ex. 20 ¶ 32.)

In fact, Plaintiffs admit that the underlying allegations pertain to "damaged areas . . . owned and occupied by the Community Association," evidenced by the fact that Northridge "conveyed the entire property to the Association when 75% of the Units had been sold." (Pls.' Resp. to DMSJ at 20.) Thus, Plaintiffs' work on the Community was completed when the Community Association brought its lawsuit, and the alleged "property damage" is therefore included in the "products-completed operations hazard."

Accordingly, I find that the underlying allegations arise out of Plaintiffs' "real estate activities" and fall within the "products-completed operations hazard." Consequently, even if the underlying allegations triggered a duty to defend, the "Real Estate Development Activities – Completed Operations" exclusion would apply.[12]

## IV.    Conclusion

For the foregoing reasons, I find that the allegations against Plaintiffs in the underlying action are based solely on claims of faulty workmanship and thus do not amount to an "occurrence" under the policies. As a result, Defendants have no duty to defend Plaintiffs. Moreover, the "Real Estate Development Activities – Completed Operations" exclusion applies, thus barring coverage. Accordingly, I will grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment.[13]

An appropriate Order follows.

---

[12] Defendants argue that alternatively, certain exclusions for "Damage to Property" bar coverage. Because I find that the "Real Estate Development Activities – Completed Operations" exclusion sufficiently precludes coverage, I need not address this argument.

[13] Because there is no duty to defend, it follows that there is no duty to indemnify. See Sikirica, 416 F.3d at 225; Kvaerner, 908 A.2d at 896 n.7.